IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| OREGON NATURAL DESERT ASS'N and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No. 06-946-KI |
| vs. | ) ) | OPINION AND ORDER |
| D. ROBERT LOHN, Regional Administrator, Nat'l Marine Fisheries Serv., NAT'L MARINE FISHERIES SERV., CARLOS M. GUTIERREZ, Secretary, U.S. Department of Commerce, DAVID R. ALLEN, Regional Director, U.S. Fish and Wildlife Service, GARY S. MILLER, Field Supervisor, U.S. Fish and Wildlife Service, U.S. FISH AND WILDLIFE SERVICE, and DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Kristin F. Ruether
Peter M. Lacy
Oregon Natural Desert Association
917 SW Oak Street, Suite 409
Portland, Oregon  97205

Stephanie M. Parent
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, Oregon  97219

      Attorneys for Plaintiffs

Jill S. Gelineau
Schwabe, Williamson & Wyatt, P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, Oregon  97204

M. Reed Hopper
Damien M. Schiff
Pacific Legal Foundation
3900 Lennane Drive, Suite 200
Sacramento, California  95834-1909

      Attorneys for Applicant Defendant-Intervenors

Karin J. Immergut
United States Attorney
District of Oregon
Stephen J. Odell
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902

Matthew McKeown
Acting Assistant Attorney General
Jean E. Williams
Lisa L. Russell

-and-

Page 2 - OPINION AND ORDER

Meredith L. Flax
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P. O. Box 7369
Washington, D. C.  20044-7369

    Attorneys for Federal Defendants

KING, Judge:

Two environmental organizations, the Oregon Natural Desert Association and the Center for Biological Diversity, bring an action against the National Marine Fisheries Service ("NMFS") and the U.S. Fish & Wildlife Service ("FWS") and several individuals in their official capacity (collectively, "federal defendants"), alleging violations of the Endangered Species Act ("ESA"). Before the court are the Cross-Motions for Summary Judgment filed by each party (#24, 33).

## BACKGROUND

I.    <u>Procedural Background</u>

A Motion to Intervene was filed on behalf of several grazing permit applicants:  Robert L. Brooks, Kenneth R. Brooks, Crum Farming, Inc., Jerome P. McElligott, Matthew C. McElligott, McElligott Joint Trust, Bud McGirr, Vaughan Ranch, Inc., Rocky Bluff Ranch, and Peter McElligott (collectively "applicants").  The court denied their motion to intervene in the liability phase, but granted it in the remedial phase.  The court also ordered that it would treat their already-filed proposed motion for summary judgment as an amicus brief.

Page 3 - OPINION AND ORDER

II.    Factual Background[1]

The Malheur National Forest has, in the past, consulted annually with both NMFS and FWS regarding the impacts of the Forest Service's livestock grazing authorizations on threatened Middle Columbia River ("MCR") steelhead trout and threatened bull trout.   Grazing has degraded fish habitat in the project area through reducing riparian vegetation and causing bank destabilization, excessive sedimentation, and increased stream temperatures.

When cattle enter streams to loaf, drink or cross the stream they may trample redds (spawning nests).  When juvenile fish are present in a stream, livestock startle or harass them away from cover.

Livestock grazing can degrade salmonid habitat by removing riparian vegetation, destabilizing stream banks, widening stream channels, promoting incised channels, lowering water tables, reducing pool frequency, increasing soil erosion, and altering water quality.  These effects can reduce cover, increase summer water temperatures, promote formation of anchor ice in winter, and increase sedimentation into spawning and rearing habitats.  (Federal defendants note that livestock grazing conducted under proper management strategies and adequate conservation measures can minimize the adverse impacts of grazing and contribute to improving aquatic conditions.)

NMFS listed the MCR steelhead as threatened under the ESA on March 25, 1999.  64 Fed. Reg. 14,517.  This listing was reaffirmed on January 5, 2006.  71 Fed. Reg. 834.  The listing

---

[1]Federal defendants assert that the Concise Statement of Material Facts is inapplicable here where the federal defendants' actions will be determined based on the court's review of the administrative record.  Nevertheless, because I think the statement of facts is helpful in tracking the evidence, I have set forth here the facts upon which the parties agree.

rule stated that the John Day River population is substantially lower than historic levels, and the

"serious declines in abundance . . . are especially troublesome, because the John Day River has

supported the largest populations of naturally spawning summer steelhead in the [Evolutionary

Significant Unit]."  64 Fed. Reg. at 14,525.  NMFS designated critical habitat for MCR steelhead

on September 2, 2005.  70 Fed. Reg. 52,630.  Many streams within the Malheur National Forest

are designated, including the tributaries of the Upper John Day, Middle Fork John Day, and

North Fork John Day rivers.

FWS listed bull trout as a threatened species, effective July 10, 1998.  63 Fed. Reg.

31,647.  The bull trout are threatened by habitat degradation and fragmentation, blockage of

migratory corridors, poor water quality, past fisheries practices, and the introduction of non-

native species.  Id.

Past and current biological opinions ("BiOps") chronicle the difficulty the Forest Service

has had in meeting the Terms and Conditions requiring compliance with grazing management

standards over the past several years.

On March 6, 2006, the Forest Service issued a steelhead Biological Assessment ("BA").

The Forest Service concluded that the 2006 Malheur National Forest grazing program "may

affect/is likely to adversely affect" steelhead on 16 grazing allotments, but "not likely to

adversely affect" steelhead critical habitat.  NMFS produced two BiOps covering the 16

allotments at issue in the Forest Service's BA.[2]  The BiOps conclude that grazing is not likely to

jeopardize the continued existence of MCR steelhead and not likely to destroy or adversely

---

[2]One NMFS BiOp covers ten allotments:  Deadhorse/Hanscombe, Beech Creek/Mt.
Vernon/John Day, Dixie, Slide Creek, Roundtop, Fox, and Lower Middle Fork.  The other covers
six allotments:  Camp Creek, Long Creek, Hamilton/King, and Donaldson/Deer.

modify their critical habitat.  The BiOps include incidental take statements, providing that a total

of five redds may be trampled by cattle.  NMFS did not acknowledge that take would occur from

habitat degradation and did not quantify take from habitat degradation.

The Forest Service issued a bull trout BA on March 2, 2006.  The Forest Service

determined that the 2006 Malheur National Forest grazing program is "likely to adversely affect"

bull trout on five grazing allotments.  The BA also states that the grazing program is "not likely

to adversely affect" bull trout critical habitat.

Formal consultation on the five allotments resulted in the 2005-06 bull trout BiOp, dated

May 5, 2006.[3]  FWS' BiOp concludes that grazing is not likely to jeopardize the continued

existence of bull trout and concurs with the Forest Service that grazing is "not likely to adversely

affect" bull trout critical habitat.  FWS' BiOp includes an incidental take statement permitting

incidental take, quantified as follows:  for "lethal take," one bull trout redd may be trampled

within the action area; for "non-lethal take," the incidental take is expressed in terms of the

number of days authorized for grazing to occur within the action area where immediate impacts

to bull trout are expected.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

---

[3]The bull trout allotments are the Deardorff, Hot Springs, Lower Middle Fork, Rail
Creek, and Summit Prairie allotments.

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.   Summary of the Allegations

Plaintiffs allege that federal defendants have violated the ESA by issuing flawed BiOps

concerning the impacts of livestock grazing on threatened bull trout and steelhead in the Malheur

National Forest.  Specifically, plaintiffs allege that NMFS violated the ESA by issuing two

BiOps in 2006 that:  (1) do not properly consider whether grazing will destroy or adversely

modify designated steelhead critical habitat; (2) do not properly consider whether grazing will

jeopardize the continued existence of steelhead; and (3) include incidental take statements which

inadequately quantify the take amounts and inexplicably raise the permitted take amounts.

Plaintiffs also challenge a 2005-06 BiOp issued by FWS for bull trout, arguing that it:

(1) does not properly consider whether grazing will jeopardize the continued existence of bull

trout; and (2) includes a flawed incidental take statement.

Plaintiffs request that the court declare the three BiOps (two issued by NMFS, one by

FWS) violate the ESA, set the BiOps aside, order the agencies to rescind them and consult again

to issue valid BiOps for the Malheur National Forest grazing program, and "[g]rant such further

relief as the Court deems just and proper."  Complaint, ¶ F.

II.    Legal Framework

The ESA dictates a framework within which each federal agency must evaluate their proposed actions to "insure" that the action will not "jeopardize the continued existence of" listed species or result in the "destruction or adverse modification" of the species' critical habitat. 16 U.S.C. § 1536(a)(2). In implementing this duty, the action agency prepares a biological assessment (BA) to be used in consultation with the relevant consulting agency, either NMFS or FWS,[4] to determine whether the action is likely to adversely affect listed species or critical habitat. 50 C.F.R. § 402.12.

NMFS or FWS uses the BA in evaluating the proposed action, including the action's cumulative effects, and determines whether the action will jeopardize the species or adversely modify the species' critical habitat. 50 C.F.R. § 402.14. If NMFS or FWS concludes that the proposed action is likely to jeopardize the continued existence of a listed species or result in adverse modification of critical habitat, the consulting agency suggests reasonable and prudent alternatives for avoiding jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3).

Even if NMFS or FWS concludes that the proposed action is not likely to jeopardize the continued existence of a listed species or result in the adverse modification of critical habitat, but believes that the action will result in take of a listed species, the agency must issue an incidental take statement. 16 U.S.C. § 1536(b)(4). The consulting agency includes terms and conditions to minimize any "take" of the listed species, and any "take" in conformance with the incidental take statement is exempt from liability under Section 9 of the ESA.[5]

_____

[4]NMFS is responsible for anadromous species and FWS is responsible for inland and terrestrial species. 50 C.F.R. § 402.01.

[5]This is a short-hand description of the duties, identifying only the steps relevant to this

Page 8 - OPINION AND ORDER

Under the APA, the court may overturn an agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999).  In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Marsh, 490 U.S. at 378.

> A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm., 92 F.3d 940, 942 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The agency must articulate a rational connection between the facts found and the conclusions made.  Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency.  O'Keeffe's, 92 F.3d at 942.  The court also must give deference to the agency when there is a difference of opinion on the impact of the proposed action.  Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1449 (9th Cir. 1996).

III.   Whether Plaintiffs' Case is Moot

Federal defendants contend they are in the midst of a five-year consultation for the 2007 through 2011 grazing seasons, which consultation is scheduled to be completed in May 2007.  In

addition, the grazing season covered by the 2006 steelhead BiOps issued by NMFS and the 2005-06 bull trout BiOp issued by FWS have ended.  The only relief plaintiff could get would be an order directing federal defendants to reinitiate consultation on the proposed action–grazing during the 2006 season.  That grazing has already occurred, so the action is moot.  See Southern Utah Wilderness Alliance ("SUWA") v. Smith, 110 F.3d 724, 727-28 (10th Cir. 1997) (if no specific relief available, federal court lacks jurisdiction).

Federal defendants have a heavy burden to demonstrate mootness.  Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir. 2001).  "A moot action is one where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam) (internal quotations omitted).  However, "completion of activity is not the hallmark of mootness.  Rather, a case is moot only where no effective relief for the alleged violation can be given."  Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065 (9th Cir. 2002).

Plaintiffs contend that the court can grant declaratory and injunctive relief, and is not limited to merely ordering re-initiation of consultation.  Plaintiffs seek a declaration as to "what is or is not legally acceptable," ONDA Reply/Response on Cross-Mot. for Summ. J. at 5, and suggests that an opinion would help "guide" future plans or actions.

After long consideration of this issue, I conclude that the declaration plaintiffs request would not affect any live issue in front of me now.  The 2006 grazing season is over, and the BiOps at issue in this challenge have expired with the conclusion of the grazing season.  In sum, unless an exception to the mootness doctrine applies, nothing that I declare will "affect the matter

in issue in the case before" the Court.  See Forest Guardians v. Johanns, 450 F.3d 455, 461 (9th

Cir. 2006) (quoting Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992)).

As for relief other than a declaratory judgment, plaintiffs concede that the Court could not

order injunctive relief halting grazing since they have brought suit only against the consulting

agencies, not the action agency.  However, plaintiffs suggest that the Court could order the

consulting agencies to mitigate the harm caused by the grazing that took place pursuant to the

allegedly unlawful BiOps.  Based on the argument submitted, I am not convinced.  Plaintiffs

provide no case law directly on point, and I can find none.  Instead, plaintiffs rely on cases

brought against action agencies–defendants who have control over the resources at issue.  Forest

Guardians, 450 F.3d at 462 (declaration would "govern Forest Service's actions for the

remainder of the allotment's permit term"); Northwest Envt'l. Defense Ctr. v. Gordon, 849 F.2d

1241, 1245 (9th Cir. 1988) (could counteract violation by ordering defendant "to consider any

damage caused by the [violative] measures in formulating the [new] measures").

I recognize plaintiffs' argument that what NMFS or FWS says in a BiOp could have

powerful ramifications.  See Bennett v. Spear, 520 U.S. 154, 168-69 (1997) (in evaluating

whether plaintiffs' injury is "fairly traceable" to the consulting agency, for purposes of standing,

court concluded that BiOp has "powerful coercive effect on the action agency").  Nevertheless, in

the end, NMFS and FWS are serving in an advisory capacity here and any ability to effect change

is largely within the Forest Service's discretion.

Consequently, I turn to plaintiffs' argument that an exception to the mootness doctrine

applies–that of capable of repetition yet evading review.  See Biodiversity Legal Foundation v.

Badgley, 309 F.3d 1166, 1173 (9th Cir. 2002).  "Government actions fall within this category if

(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." Greenpeace Action v. Franklin, 14 F.3d 1324, 1329 (9th Cir. 1992). There must be a "reasonable expectation" or a "demonstrated probability" that the "same controversy will recur involving the same complaining party." Murphy v. Hunt, 455 U.S. at 482. It is the plaintiffs' burden to demonstrate the second factor of the test. Lee v. Schmidt-Wenzel, 766 F.2d 1387, 1390 (9th Cir. 1985) ("plaintiffs have the burden of proving that there is a reasonable expectation that the challenged activity will recur over their objection").

The 2006 BiOps were in effect for less than one year, making it nearly impossible to obtain effective judicial review. Federal defendants argue that because they expect to issue a five year BiOp covering grazing beginning this summer, the challenged action is not so short as to evade review. However, the cases upon which federal defendants rely are not directly applicable because the agencies in those cases actually issued a subsequent BiOp longer in duration than the previous BiOp. American Rivers v. NMFS, 126 F.3d 1118, 1123-24 (9th Cir. 1997) (challenge to 1994-1998 BiOp moot when superseded by 1995-1998 BiOp) and Idaho Dep't of Fish & Game v. NMFS, 56 F.3d 1071, 1075 (9th Cir. 1995) (challenge to 1993 BiOp moot when superseded by 1994-1998 BiOp). Here, I have only federal defendants' expectation that subsequent BiOps will be five years in duration. An expectation does not provide sufficient assurance to support a conclusion that plaintiffs will have time to obtain judicial review of the controversy at the center of the 2006 BiOps.

In addition, the controversy concerning the 2006 BiOps will continue in the context of succeeding BiOps. In other words, the very same question of whether NMFS and FWS have

properly interpreted and applied the ESA in examining the effects of grazing on steelhead and bull trout is likely to recur during the upcoming grazing season, and because federal defendants deny the allegations in the Complaint, any errors are likely to be repeated. Furthermore, plaintiffs' criticism of federal defendants' analysis is unrelated to any specific allotment, but is instead directed at the agencies' broader approach to questions of recovery and jeopardy. Accordingly, it is irrelevant that the agencies may be considering different allotments in any subsequent BiOp.

Based on the foregoing, plaintiffs' claims comply with the exception to the mootness doctrine, and are capable of repetition yet evading review.

IV.   Plaintiffs' Claims

A.   Critical Habitat Determinations

Plaintiffs argue that NMFS did not comply with the ESA or the direction of the Ninth Circuit in Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059, 1071-72 (9th Cir. 2004) that the agency must "consider[] recovery in its critical habitat inquiry" and determine "whether adequate critical habitat would remain to ensure species recovery."

1.   The Recovery Role of Critical Habitat

Section 7(a)(2) of the ESA requires each federal agency to "insure" that its action will not "jeopardize the continued existence of" listed species or result in the "destruction or adverse modification" of the species' critical habitat. 16 U.S.C. § 1536(a)(2). "Critical habitat" is that land that has been determined to have "those physical or biological features" that are "essential to the conservation of the species." 16 U.S.C. § 1532(5)(A). "Conservation," in turn, is defined to mean, "the use of all methods and procedures which are necessary to bring any endangered or

threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532 (3).

The Ninth Circuit recently struck down a portion of the federal defendants' regulatory definition of adverse modification.  The regulation defined the term to mean a "direct or indirect alteration that appreciably diminishes the value of critical habitat for *both* the survival *and* recovery of a listed species."  50 C.F.R. § 402.02 (emphasis added).  The Ninth Circuit found the regulation unlawful because it understood the regulation meant the consulting agency could conclude that "no adverse modification" to critical habitat would occur even if the action would affect the prospect for the species' recovery.  The Ninth Circuit opined that the regulation "reads the 'recovery' goal out of the adverse modification inquiry."  <u>Gifford Pinchot</u>, 378 F.3d at 1069.

2.    <u>Short-Term Habitat Degradation</u>

In the BiOps, NMFS concludes that grazing will not "reduce the rangewide conservation value of MCR steelhead critical habitat"[6] because, although "[t]he proposed action will adversely affect PCEs[7] essential to support those life history functions (water quality, substrate, forage,

---

[6]Federal defendants argue that NMFS evaluated whether the proposed action is expected to "appreciably reduce the prospects for the species' recovery through impacts to critical habitat," appearing to mimic the language of the "adverse modification" regulation.  Reply in Supp. of Fed. Ds.' Cross-Mot. for Summ. J. at 12.  However, nowhere do the BiOps reference the language of the regulation.  Indeed, the BiOps state expressly that NMFS did not rely on the regulatory definition of adverse modification.  NAR 1 at 1; NAR 2 at 1.  In addition, I am bothered by NMFS' reference to "rangewide" effects to critical habitat.  Indeed, the guidance NMFS purportedly relied on, NAR 68, describes looking at impacts to "critical habitat units," not critical habitat overall, and nothing in the statute as far as I can tell permits adverse modification of critical habitat on a unit by unit basis.  However, although it was raised at oral argument, the parties did not brief the issue, and I find it is not relevant to my decision.

[7]"PCEs," or Primary Constituent Elements, are the "physical and biological features identified as essential to the conservation of the listed species" and include water quality and quantity, substrate, natural cover from predators and forage.  NAR 1 at 23-24; NAR 2 at 18-19.

natural cover)," the "effects are expected to be minimized by the proposed grazing management and not carry over to the next year." NAR 1 at 47; NAR 2 at 39.[8]

After reading the BiOps and considering the parties' arguments, I find NMFS' "no adverse modification" conclusion is arbitrary and capricious.

First, NMFS does not explain how the admitted adverse effects of grazing, combined with the already degraded baseline, does not result in adverse modification of critical habitat. Pursuant to its own regulations, NMFS must evaluate the effects and cumulative effects of the action and *add those effects to the existing environmental baseline* to determine whether the action will adversely modify critical habitat. 50 C.F.R. § 402.14(g); § 402.02; see also National Wildlife Fed'n v. National Marine Fisheries, __ F.3d __, 2007 WL 1040032, *4 (9th Cir. 2007) ("National Wildlife Fed'n"); Kandra v. United States, 145 F. Supp. 2d 1192, 1207-08 (D. Or. 2001), citing Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 127-28 (D.D.C. 2001).

The BiOps are forthright about the poor condition of the critical habitat: (1) migratory habitat quality has been "severely degraded" by hydroelectric dams, NAR 1 at 24; NAR 2 at 19; (2) water quality "is a problem," affecting spawning, rearing and migration, NAR 1 at 25; NAR 2 at 20; (3) "unsuitable" rearing and spawning habitat due to "high summer stream temperatures," NAR 1 at 25; NAR 2 at 20; (4) dissolved oxygen, phosphates, fecal coliform and sediment a problem on many streams, NAR 1 at 26; NAR 2 at 21; (5) "low summer stream flow" due to overgrazing and water withdrawals has caused "a variety of adverse impacts to MCR steelhead habitat," NAR 1 at 25; NAR 2 at 20; (6) overall, all relevant indicators of healthy steelhead habitat in the Middle Fork John Day and Upper John Day River subbasins are "Functioning at

---

[8]I refer to NMFS' administrative record as NAR, using the page number (as opposed to the pdf number), and to FWS' record as FAR, using the Bates Stamp number.

Page 15 - OPINION AND ORDER

Unacceptable Risk" or "Functioning at Risk," NAR 1 at 29, 31; NAR 2 at 24, 26; and (7) only

three of the seventeen indicators are considered "Properly Functioning" in the North Fork John

Day River subbasin.  NAR 1 at 30; NAR 2 at 25.  NMFS also concedes that "[a]n environmental

baseline that does not meet the biological requirements of a listed species may increase the

likelihood that adverse effects of the proposed action will result in jeopardy to a listed species or

in destruction or adverse modification of a designated critical habitat."  NAR 1 at 27; NAR 2 at

22.[9]

     NMFS separately documents the negative effects of grazing on critical habitat generally,

some of which are that:  (1) grazing reduces streamside vegetation, which reduces available fish

prey; (2) streambank damage, which can occur even under light or moderate grazing pressure,

reduces fish production; (3) loss of streamside vegetation causes warmer water temperatures; (4)

higher temperatures and cattle waste lead to lower dissolved oxygen levels; and (5) sediment

affects spawning.  NAR 1 at 40-41; NAR 2 at 33-34.  In addition, although NMFS does not

evaluate the effects of this proposed action on an allotment by allotment basis, NMFS disclosed

that the proposed action would result in increased turbidity and sediment deposits, decreased

dissolved oxygen levels, increased temperatures, increased erosion,"less clean gravel" for

spawning, and reduced fish prey and cover.  NAR 1 at 45-46; NAR 2 at 37-38.

     NMFS admits that the critical habitat at issue here is extremely important to the recovery

of the species, NAR 1 at 26; NAR 2 at 21, and admits that grazing "*will* adversely affect PCEs

essential to support those life history functions (water quality, substrate, forage, natural cover)"

---

     [9]Although I note NMFS' argument that some of the allotments are in an "upward trend,"
nevertheless NMFS identifies all the relevant indicators of healthy habitat as "functioning at risk"
or "functioning at unacceptable risk."

Page 16 - OPINION AND ORDER

of steelhead.  NAR 1 at 47, NAR 2 at 39 (emphasis added).  Yet, despite the overwhelming

evidence of habitat degradation referenced above, in an already degraded baseline, NMFS

concludes that the grazing will not adversely modify critical habitat.

NMFS resorts to the grazing management program, arguing that it is designed to

minimize adverse effects to steelhead and lead to improving riparian conditions.  The grazing

management program relies on the concept of "near natural rates of recovery" as described in the

PACFISH[10] standards and guidelines, and as applied to grazing through "Enclosure B."[11]  In the

BiOps, NMFS explains:

> [T]he MNF has stated that allotments will be adjusted to meet **near natural rates
> of recovery**, as defined by PACFISH Enclosure B and by Forest Plan standards.
> The MNF has also developed desired riparian objectives and endpoint indicators
> as condition thresholds.  According to the BA, PACFISH Enclosure B states that
> **near natural rates of recovery** will be presumed to occur when:  (1) Condition
> thresholds (i.e., endpoint indicators) are not exceeded; (2) standards and
> guidelines for forage and browse utilization are not exceeded; and (3) 70% rate of
> recovery is documented based on comparison of key factors responsive to
> livestock grazing (such as hardwood density, canopy cover, etc.) between areas of
> similar site potential that are excluded from livestock grazing but are open to
> other management influences and to areas open to livestock grazing.  The MNF
> has interpreted meeting near natural rates of recovery to mean avoiding effects
> that carry over to the next year to prevent the likelihood of cumulative, negative
> effects.  The MNF also states that "influences that carry over to the next year
> would meaningfully impede recovery."

NAR 1 at 6; NAR 2 at 4-5. (emphasis in original).

---

[10]"PACFISH and INFISH provide programmatic direction for management of lands
administered by the USFS and BLM.  Both are interim strategies intended to provide protection
against extinction or further endangerment of fish stocks and to maintain long-term management
options []."  FAR 175 at 7266.  PACFISH amended the management plans of fifteen national
forest and 7 BLM districts across the west; INFISH amended 22 Forest Plans.

[11]Recommended Livestock Grazing Guidelines, a supplement to PACFISH.  USFS
August 14, 1995.

The "condition thresholds," also called "move indicators" and "endpoint indicators," are intended to function as a warning signal to the permittee, to ensure that allotments are not over-grazed. These indicators include measures such as stubble height of grasses, percent of riparian shrub use, and bank alteration. The indicators are included in the permittee's annual operating instructions, and permittees are required to move cattle off an allotment before the indicators are reached. NAR 1 at 7 n. 4; NAR 2 at 6 n.4. According to NMFS, "[w]hen these condition thresholds are met consistently, the riparian area is expected to improve and move towards the desired potential for that site that will support ESA-listed fish species." NAR 1 at 7; NAR 2 at 6.

Even if the grazing management strategy I have just described does indeed lead to "near natural rates of recovery," NMFS may not rely on it to support its adverse modification conclusion because NMFS has failed to evaluate whether short-term habitat degradation caused each grazing season will reduce the steelhead's ability to survive and recover. The Ninth Circuit has made it clear that NMFS is to consider the action in the context of the "life cycle and migration cycle of anadromous fish." Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. NMFS, 265 F.3d 1028, 1037 (9th Cir. 2001) ("Pacific Coast Fed'n I"); Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1094 (9th Cir. 2005) ("Pacific Coast Fed'n II"); National Wildlife Fed'n, 2007 WL 1040032, *11.

NMFS has conceded that the effects of grazing on "temperature, sediment, nutrients, and the productivity of invertebrate prey species preferred by steelhead" will "correspond to spawning and rearing life history stages in some allotments, and to rearing and migration life history stages in others" and that "[t]hese effects are likely to persist as long as cattle have access to streams designated as critical habitat." NAR 1 at 45; NAR 2 at 37. While NMFS does not

Page 18 - OPINION AND ORDER

expect these effects to carry over to the next year, NMFS has not adequately evaluated how these short-term impacts will affect the role critical habitat plays in assisting the recovery of steelhead.

It is true, as NMFS points out, that <u>Pacific Coast Fed'n I</u> dealt with a time frame of 10 to 20 years, and <u>Pacific Coast Fed'n II</u> and <u>National Wildlife Fed'n</u> involved a time period of 5 years. However, NMFS admits that the action here allows cattle to access streams during crucial life stages–spawning and rearing. Accordingly, NMFS must consider whether impacts on critical habitat from grazing will affect steelhead survival and recovery in the context of the life cycle of the species. Its failure to do so renders its conclusion that the proposed action would not result in adverse modification of critical habitat arbitrary and capricious.

### 3.    Long-Term Habitat Degradation

Plaintiffs also argue that the NMFS' "no adverse modification" conclusion is overly reliant on the actions of private individuals, some of whom have had problems complying with the grazing management standards in the past. In short, according to plaintiffs, there is too much uncertainty as to whether the grazing management program as designed will avoid adverse modification to the critical habitat.

Mitigation measures must be "reasonably specific, certain to occur, and capable of implementation." <u>Center for Biol. Diversity v. Rumsfeld</u>, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1379-80 (9th Cir. 1987)); <u>National Wildlife Fed'n</u>, 2007 WL 1040032, * 12 ("even a sincere general commitment to future improvements" insufficient to "offset . . . certain immediate negative effects, absent specific and binding plans").

Past compliance with grazing management standards is a documented problem. In a September 23, 2005 e-mail a NMFS biologist reported poor conditions on almost every allotment. Plaintiffs set forth one example.

> [F]or the Beech Creek/Mt. Vernon/John Day allotment, the memo notes that the BA and [Annual Operating Instructions] list different stubble height standards; it states that one unit is in "terrible shape," but that the Forest Service increased [Animal Unit Months] by 84 from 2004. Although the 2004 [End-of-Year] report indicated that all desired attributes except one were below desired values, the Forest Service response was to increase use by 97 AUMs. The suggestions conclude by stating, "[n]eed to substantially modify the action to address the impacts at the allotment scale rather than to simply fence or move monitoring areas."

ONDA Reply/Response at 23 (citing NAR 9). The NMFS biologist made similar statements on each allotment.

Another NMFS biologist wrote a memo four months later commenting that "few, if any, changes were made to the proposed action, conservation measures, and management strategies to address the concerns outlined previously." NAR 131 at 1. In addition, the biologist stated, "NMFS expects that using this range of indicators will result in significant adverse habitat effects in certain areas." Id. The biologist listed concerns for a number of allotments, none of which were implemented by the Forest Service.

The BiOps do not imply that swift and necessary action will be taken when violations are found. For example, the BiOps state, "With *excessive, repeated* failures, 'permit action' to remedy the situation *may be* warranted for resource protection," and "[f]ailure to meet move trigger/move indicators due to permittee lack of knowledge, effort or engagement *could* be

rectified through firm, fair administration of the grazing permit and reflected in the next year's

annual operating instructions."  NAR 1 at 7, 8; NAR 2 at 6, 7 (emphasis added).[12]

The history of even some noncompliance with grazing management standards, in

combination with vague statements about what, if any, administrative corrective action will be

taken against noncompliant permittees, make it arbitrary and capricious for NMFS to rely on the

grazing management program in concluding no adverse modification of critical habitat.

B.    Jeopardy

The agencies define "jeopardize the continued existence of" to mean "engage in an action

that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of that species."  50 C.F.R. § 402.02.  The Ninth Circuit has recently

explained that pursuant to this regulation, the agencies must consider the impacts of the proposed

action on the survival as well as the recovery of the listed species.  National Wildlife Fed'n, 2007

WL 1040032, *10.

1.    NMFS' Jeopardy Conclusion

NMFS concludes the following with regard to jeopardy:

The MCR steelhead in MNF grazing allotments that are likely to be adversely
affected by the proposed action are a small proportion of the MCR steelhead ESU
overall.  The identification of redds through spawning surveys and the grazing
systems applied to those areas, including monitoring, are expected to reduce cattle
access to spawning areas and reduce the number and severity of interactions with
redds, including trampling.  At the most, three redds are expected to be trampled
by cattle in these allotments.  This level of disturbance will result in adverse

[12]The fact that the Forest Service provided NMFS with no evidence that "near natural rate
of recovery" is actually occurring, because the Forest Service provides very little in the way of
effectiveness monitoring, is also troubling and further supports my conclusion that the grazing
management program is not "certain" to provide long-term improvement of critical habitat.  See
Pls'. Reply/Response on Cross-Mot. for Summ. J. at 19, n.8 (reciting monitoring efforts).

effects that will not appreciably affect the abundance, distribution, diversity, or productivity of this species at either the population or species level.

NAR 1 at 47; NAR 2 at 39.

First, it is not clear from this statement whether NMFS complied with its own regulation and considered whether "[t]his level of disturbance" would "reduce appreciably the likelihood of both survival and recovery" of steelhead, placing the same amount of emphasis on recovery as it does on survival. See National Wildlife Fed'n, 2007 WL 1040032, *10.

Second, in analyzing whether a proposed action will jeopardize a species, NMFS must "[e]valuate the current status of the listed species or critical habitat" and "[e]valuate the effects of the action and cumulative effects on the listed species." 50 C.F.R. § 402.12(g)(2), (3). "Effects of the action" include both "direct and indirect effects." 50 C.F.R. § 402.02.

As plaintiffs point out, there is no indication in the BiOps that NMFS considered any effects of grazing on the species in arriving at its no-jeopardy conclusion. NMFS specifically identifies the possibility of cattle "directly" stepping on redds, and discusses generally that grazing causes increased dissolved oxygen levels, turbidity, and bank destablization. However, NMFS does not describe any effects on habitat caused by grazing in its allotment-specific analysis and, more importantly, does not indicate that it considered how the admitted habitat degradation would affect the survival and recovery of steelhead in arriving at its "no jeopardy" conclusion.

NMFS asks the court to conclude that it evaluated the effects of habitat degradation in the critical habitat components of the BiOps. However, NMFS does not include any statement in the BiOps' conclusions as to how habitat degradation would affect the "reproduction, numbers, or distribution" of steelhead, 50 C.F.R. § 402.02 (definition of "jeopardize"), and NMFS' critical

habitat conclusion is focused on whether the action will "reduce the rangewide conservation value" of the habitat.  NAR 1 at 47.  Where NMFS has treated each standard separately, and where the standards are different, I cannot read into the analysis something that is absent.  See Pacific Coast Fed'n II, 426 F.3d at 1091 (court cannot rely on "implicit" reasoning as opposed to what agency "actually said").

In addition, as explained above, NMFS cannot rely on the grazing management strategy, and its promise of "near natural rates of recovery," when the mitigation is not "reasonably certain" to occur.[13]  As a result, NMFS' no-jeopardy conclusion is arbitrary and capricious.

2.      FWS' Jeopardy Conclusion

FWS concludes that:

[T]he Forest's 2006 grazing management program, for the five allotments addressed in this Opinion, is not expected to appreciably reduce numbers, reproduction, or distribution of bull trout.  The Service further concludes that the Forest's 2006 grazing management program is not expected to prevent attainment of the conservation needs identified for bull trout within the draft John Day and Malheur Recovery Units.  However, baseline conditions and future cumulative effects in the subbasins where Forest grazing activities occur are of continuing concern to the Service, as these effects are likely to restrict bull trout range expansion and slow recovery efforts.

FAR at 0045.[14]

In contrast to NMFS' "no jeopardy" conclusion, FWS did consider whether the grazing management program would affect recovery of the bull trout, concluding that it was "not expected to prevent attainment of the conservation needs" of the bull trout.  Id.  Moreover,

---

[13]I do not consider plaintiffs' alternative argument, that NMFS improperly relied on PACFISH, or that FWS relied on INFISH, as a surrogate for their no-jeopardy findings without evaluating the project's consistency with PACFISH or INFISH, because federal defendants made it clear in their briefing that they undertook an independent jeopardy analysis.
[14]The briefing on FWS' jeopardy analysis was limited.

plaintiffs do not complain about FWS' analysis of the effects of habitat degradation on the

survival and recovery of bull trout.

Additionally, although FWS notes the problems with meeting grazing management

standards in 2002, 2003 and 2004, FWS states that "[t]he permittee *can and will* be held

accountable for being in compliance with all Terms and Conditions of the Grazing Permit AOIs"

including "resource damage resulting in not meeting move triggers/move indicators that lead to

non-compliance with Forest Service responsibilities for Forest Plan standards, INFISH RMOs,

and near natural rate of recovery." FAR 1 at 0011 (emphasis added). This statement is

sufficiently strong to constitute a measure that is "reasonably specific, certain to occur, and

capable of implementation." See Center for Biol. Diversity v. Rumsfeld, 198 F. Supp. 2d at 1152

(D. Ariz. 2002).[15]

Therefore, I do not find that FWS' "no jeopardy" conclusion is arbitrary and capricious.

C.    Incidental Take Statements

If NMFS or FWS finds that a proposed action, or an action as modified by a reasonable

and prudent alternative, is not likely to jeopardize the continued existence of a listed species or

result in adverse modification of critical habitat, but it determines that the proposed action is

likely to result in the incidental taking of a listed wildlife or fish species, then NMFS or FWS

issues an incidental take statement. 16 U.S.C. § 1536(b)(4).

An incidental take statement must (1) identify the amount or extent of the incidental take;

(2) include reasonable and prudent measures to minimize the impact; and (3) specify the terms

and conditions to meet the reasonable and prudent measures. 50 C.F.R. § 402.14(i)(1)(i), (ii),

---

[15]In addition, I note that plaintiffs did not complain about the lack of effectiveness
monitoring on the allotments covered by FWS' BiOp.

(iv).  "Take" is defined to include "harm," which in turn means "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  16 U.S.C. § 1532 (19); 50 C.F.R. § 222.102 (NMFS' definition); see also 50 C.F.R. § 17.3 (similar FWS' definition).

1.    NMFS' Incidental Take Statement

Plaintiffs complain that NMFS failed to include a reasonable and prudent measure directed at limiting the effects of grazing on habitat, thereby minimizing the incidental take of the species.  NMFS responds that it was not required to include a reasonable and prudent measure limiting take from those effects because it concluded that no take from habitat disturbance would occur.  NMFS did not expect that the short-term adverse habitat effects would rise to the level of harm sufficient to be considered "take."

Nowhere in the BiOps does NMFS say that the effects of grazing will not result in take.  NMFS points to its critical habitat conclusion, that the "effects are expected to be minimized by the proposed grazing management and not carry over to the next year, and thus are not likely to reduce the rangewide conservation value of MCR steelhead critical habitat."  NAR 1 at 47; NAR 2 at 39.  However, as explained above, NMFS' critical habitat conclusion improperly relies on the grazing management strategy.  Accordingly, it cannot be the basis for NMFS' conclusion that the proposed action would not result in "take" of the species.[16]

In evaluating effects to critical habitat generally, NMFS admits that the effects of grazing on "temperature, sediment, nutrients, and the productivity of invertebrate prey species preferred

---

[16]In addition, the grazing management strategy could not constitute a "reasonable and prudent measure" because it is not "certain to occur," for the reasons stated above.

by steelhead" will "correspond to spawning and rearing life history stages in some allotments, and to rearing and migration life history stages in others" and that "[t]hese effects are likely to persist as long as cattle have access to streams designated as critical habitat."  NAR 1 at 45; NAR 2 at 37.  Without an evaluation of indirect effects of grazing on an allotment by allotment basis, as discussed above, and given these admitted effects of grazing, NMFS' reasoning for finding these effects would not result in take to steelhead is arbitrary and capricious.

Plaintiffs also argue that the BiOps double the number of "direct" take permitted under the incidental take statement, as compared with past years, without offering any explanation for the change.  In response to plaintiffs' argument that the BiOps inexplicably double the number of "direct" take, NMFS responds that each BiOp is to be evaluated on its own record and the take allotted in the 2006 BiOps is supported by the record.

In 2004, NMFS permitted no more than two redds could be taken from trampling.  In 2006, NMFS permits a total of five redds to be trampled.  According to plaintiffs, this is a reversal of policy, citing Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1345 (9th Cir. 1990), placing the burden on federal defendants to show "not only that its new policy is reasonable, but also to provide a reasonable rationale supporting its departure from prior practice."

I agree with NMFS that permission to take a certain number of species in an earlier BiOp does not amount to a "policy" such that a subsequent allowance of more take would constitute a "reversal of policy."  So long as the level of incidental take does not rise to the level of jeopardy, and so long as NMFS mandates measures that limit the level of incidental take, NMFS may change the level of take permitted from year to year.  In one BiOp, NMFS explained that the take of three redds, and two redds in the other BiOp, would not "appreciably affect the abundance,

distribution, diversity, or productivity of this species at either the population or species level."
NAR 1 at 47; NAR 2 at 39.  NMFS set forth reasonable and prudent measures that it believed
would minimize the level of incidental take caused by the direct effects of grazing.  As a result, it
was not arbitrary and capricious for NMFS to identify the level of incidental take it did.

Nevertheless, because NMFS did not consider whether incidental take from habitat
degradation would occur, as explained above, NMFS' incidental take statements are arbitrary and
capricious.

### 2.    FWS' Incidental Take Statement

Plaintiffs complain that FWS' incidental take statement does not limit the amount or
extent of take on the species caused by habitat degradation.

An incidental take statement should ideally specify the number of the species that may be
taken.  If a hard number is not one that can be "practically obtained," the agency may use a
proxy.  Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273 F.3d 1229, 1250 (9th Cir.
2001).  To use a proxy, FWS must establish "an articulated, rational connection between [the
proxy] and the taking of the species."  Id. at 1251.  The proxy should establish a limit "by which
the . . . action agency can gauge [its] performance."  Id. at 1250.

FWS' incidental take statement limits take such as "harm or harassment of individual
adults, juveniles, eggs, and fry in the gravel where grazing is scheduled to occur within bull trout
watersheds after August 15" that would take place during "the number of days authorized for
grazing to occur within the action area, where immediate impacts to bull trout are expected."
FAR 1 at 0046.  Plaintiffs argue this is merely a reiteration of the project itself, and does not
provide a way for FWS to "gauge [its] performance."  Arizona Cattle Growers, 273 F.3d at 1249.

Plaintiffs subsequently directed the court to a recently issued opinion in the Ninth Circuit

Oregon Natural Resources Council v. Allen, 476 F.3d 1031 (9th Cir. 2007) ("ONRC v. Allen").

In that case, the court explained, "Congress has clearly declared a preference for expressing take

in numerical form, and an Incidental Take Statement that utilizes a surrogate instead of a

numerical cap on take must explain why it was impracticable to express a numerical measure of

take.  Because the Incidental Take Statement at issue contains no numerical cap on take and fails

to explain why it does not, it violates the ESA." 476 F.3d at 1037.  The Ninth Circuit also

reiterated that, even if a numerical value is impossible to obtain, the incidental take statement

must "adequately trigger reinitiation of consultation."  Id. at 1038.

Here, although FWS explains why detailing a numerical cap would be difficult, the non-

numerical proxy does not "set forth a trigger that would invalidate the safe harbor provision and

reinitiate the consultation process."  Id.; see FAR 1 at 0046  (incidental take statement explains,

"The inherent biological characteristics of aquatic species such as the bull trout make observing

death or harassment effects from the project difficult; however, it is still necessary to quantify the

take we expect may result").  Like the incidental take statement at issue in ONRC v. Allen, the

incidental take statement here authorizes a level of take that is reached only when "the project

itself is complete" and is "coextensive with the project's own scope." 476 F.3d at 1039.  A better

surrogate would, perhaps, rely on the condition of the habitat, so long as any standards were not

"so indeterminate as to prevent the Take Statement from contributing to the monitoring of

incidental take by eliminating its trigger function."  Id.[17]

---

[17]See Final ESA Section 7 Consultation Handbook, March 1998 at 4-49, *available at*
http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm (setting forth example
paragraph in which agency explains that take will be "difficult to detect," but "level of take of
this species can be anticipated by loss of [quantify amount of surrogate species, food, cover,
other essential habitat element such as water quantity or quality, or symbiont] because:  [provide

FWS' incidental take statement is arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Summary Judgment (#24) is granted and the federal defendants' Motion for Summary Judgment (#33) is denied.

IT IS SO ORDERED.

Dated this _____16th_____ day of April, 2007.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge

---

an explanation]."
Page 29 - OPINION AND ORDER